JUVENILE AND DOMESTIC RELATIONS COURT, ESSEX COUNTY.

MABEL BLACKWELL, PETITIONER, v. HOWARD G. BLACK-
WELL, DEFENDANT.

Decided January 19, 1935.

For the petitioner, *Jacob T. Friend.*

For the defendant, *Levenson, Comen & Levenson* (by *Abe
D. Levenson* and *Nathan A. Whitfield,* of counsel).

SIEGLER, J.   This is an action for support and maintenance
brought under the provisions of the Juvenile and Domestic
Relations act of 1929 (Revision), alleging as its major
ground for relief extreme cruelty by the defendant.   The peti-
tion was filed on May 4th, 1934, and the acts of cruelty com-
plained of took place on several occasions prior to April
24th, 1934.

I have very carefully considered all of the testimony,
briefs, exhibits, and pleadings in this matter.   The parties
were married on March 5th, 1919, and resided in the town
of Montclair most of their married life.   Two children were
born of the marriage, now of the ages of fourteen years and
ten years.   The petitioner in 1929 left her husband because
of the unkind names and things the defendant allegedly said
and did, and his disparaging remarks about her to persons in
the neighborhood.   Petitioner claims that the defendant tried
to turn her mother and father against her; and that on
another occasion he had refused to retire to bed with her,
and when he did he saturated her pajamas with mentholatum

or some other irritant, causing her much anguish. Reconciliation followed four months later. They appeared to be happy for about a year when, she charges, similar annoyances by the defendant began disturbing the social and marital calm of the home. She says the defendant resorted to many annoying practices; to wit.: listening to conversations of petitioner over the telephone; putting a padlock on the garage to deprive her of use of the automobile; and frequent verbal threats to "drive her crazy and break her damned neck."

It appears that the petitioner worked the greater part of her married life and used the income from these exertions for her own use, and that defendant did not provide adequately for all her needs, and that she was thus constrained to accept employment to meet her financial requirements. The children were left at home, during her working hours, in care of a maid. She did furnish slight requirements to the children in the morning and sometimes in the evening when she returned.

The petitioner testified that except for these incidents she enjoyed the hospitality, society and companionship of her husband in and out of the home. They entertained friends and accepted invitations outside their home. In February, 1934, the petitioner had a breakdown and was in bed for two weeks under the doctor's care. She describes an incident early in March as follows: As she was about to go to business one morning her husband insisted that she remain in bed. She refused; whereupon he kicked her with great force, throwing her against a dressing table, as a result of which she received a severe bruise on her thigh. He then picked up a shoe and threw it at her, but missed; the shoe, however, struck the dresser, knocked the lamp off and broke a perfume bottle. She, nevertheless, continued to live with her husband after this episode.

She tells of another incident early in April, after returning from a dinner with her husband and friends in New York City. They were about to retire when he commenced to pace up and down the room, calling her vile names and accusing her of diverse acts of improprieties; he then threw

various missiles at her and finally struck her in the back of the head with a shoe. She complains of petty annoyances by the defendant for ten days thereafter until, on April 23d, 1934, petitioner left the defendant's home and went to live in a furnished room. She left her children in the custody of her husband where they have been ever since.

Among other things, she charges that on several occasions the defendant falsely stated to her that he saw the petitioner running around with other men and accepting their society; and that he told many of petitioner's friends derogatory things about her in connection with their married life, all of which she alleges caused her considerable mental anguish. The petitioner also claims that there was an undue demand on the part of the defendant for cohabitation, which undermined her health.

The other witnesses produced by the petitioner indicate that the petitioner and the defendant were always found to be hospitable and respectable persons; that on some few occasions the defendant had spoken disparagingly of his wife to them concerning her leisure time activities.

To best illustrate the state of mind of the petitioner at and about the time she finally left him, I quote from her testimony, state of case, page 62: "*Q.* When you left him, did you tell your maid, 'I am going to get a divorce?' *A.* The last time I left; yes, I did. *Q.* Did you mean that? *A.* I certainly did. *Q.* Did you say, 'I hate him' [meaning the husband] 'I cannot tolerate him, I don't want him near me?' *A.* I probably said it. *Q.* You meant it, too, didn't you? *A.* I did. *Q.* You said on that note, 'with love and kisses, pooh.' *A.* Yes. *Q.* You meant that, too, didn't you? *A.* That is just the way I felt. *Q.* And you had been feeling that way for a long time after, haven't you? *A.* I have."

The defense is a denial of all that the petitioner has said as to physical violence. Mrs. Mitchell, a maid in the home at the time of the separation and for a year prior thereto, and who could support petitioner's charges, if true, testified that she never observed any act of cruelty, nor was she told of any assaults upon petitioner as stated by petitioner. She did not see Mrs. Blackwell come out of the room crying on

the morning petitioner says she was struck. Mrs. Mitchell tells of a conversation she had on the morning Mrs. Blackwell left the home; that she asked Mrs. Blackwell not to go and Mrs. Blackwell said that she made up her mind and she would not change it. She further testified that Mr. and Mrs. Blackwell went out to a party in New York City for dinner the night before she left her husband. She also said that she was present when Mrs. Blackwell kissed a man who was then in the living room at a party held in her home several months prior to the separation. She also testified that Mrs. Blackwell told her about a Mr. Buckley, whom she met at a birthday party in a studio where Mrs. Blackwell was employed, and that petitioner said he was very nice. Mrs. Blackwell made an arrangement with her, the witness said, that if Mr. Buckley called on the telephone and Mr. Blackwell was in the home at the time, she (Mrs. Mitchell) was to take the telephone call and tell Mr. Buckley "Beverly is not in."

The testimony of Mrs. Parker is a recital of admissions by Mrs. Blackwell of her activities which, to say the least, are suspicious and seem to corroborate much of the testimony of Mrs. Mitchell.

The witness Sid Kalli testified to a clandestine meeting of Buckley and Mrs. Blackwell in a room behind the studio. He (Sid Kalli) saw Buckley kiss her and call her "darling" and "sweetheart;" and told of the chase with Mrs. Blackwell in an automobile to overtake Mr. Buckley at Ampere Parkway, Bloomfield.

Christine Gustavson, a former employe of the Blackwells, states that Mrs. Blackwell said to her, "Mr. Blackwell didn't know how to love, any more than a jack rabbit." There was also the episode that happened in October, 1934, at the home of Mr. Leach. Mr. Kestner, a guest there, had arranged to go to the Four Towers by taxi with Mrs. Blackwell, when Mr. Blackwell suddenly appeared on the scene as they were about to enter the cab. Kestner knew that Mrs. Blackwell was a married woman who had at that time been separated from her husband for several months. It was Mr. Blackwell's appearance on the scene that broke up the plan of the trip.

These episodes incited the defendant to pursue her and to confront her with the impropriety of engaging in these affairs.

I am satisfied that the defendant is a proud and respectable man, and that he loves his wife dearly and would welcome her return to his home at any time. The petitioner, however, seems to be flirtatious, to say the least, and apparently cares little or nothing for the defendant; and yet, strange as it may seem, I am satisfied that he continues to love her. The evidence satisfies me that the petitioner did not conduct herself as a wife should, and the defendant would hardly have been a normal man if he had not bitterly resented her actions. She was constantly wounding his *amour propre*. I have no doubt that at times he would give her a tongue lashing and a shaking up. The petitioner seemed to find a perverse satisfaction in arousing the defendant's jealousy and in seeking to annoy him in many petty ways. I am of the opinion that the testimony of the petitioner has been exaggerated. It appears clear that the petitioner received the treatment she deserved.

In the quest for the truth, courts are not bound to accept as verity statements of incidents not directly denied, if the body of the testimony refutes them. Much, if not all, of petitioner's story concerning the cruelties is pure fancy, and its inspiration and development are not obscure. I find that any accusations made by the defendant and leveled at the petitioner were justified by her conduct. He did not merely make them and then forget about establishing the truth of them, but he actually brought petitioner's improper conduct to her attention and begged and pleaded that she desist. This he had a right to do even to the extent of protecting her against her own vice. Authorities on this point are too numerous and elementary to even require citation.

I find it a fact that when Mrs. Blackwell left her husband on April 23d, 1934, it was not because of any cruel treatment that was inflicted upon her by Mr. Blackwell prior to her leaving, but was the result of a determination long fixed in her mind that she no longer could carry on and discharge her sacred responsibilities as a wife and a mother. Leaving the children as she did is strong evidence that she was search-

ing for her own personal and selfish social comfort rather than sacrificing herself on the altar of that which might be for the best interest of her children.

It has been held in *Thomas* v. *Thomas,* 87 *N. J. Eq.* 668; 103 *Atl. Rep.* 675 (the next to the last paragraph on page 677 of the opinion) :

"If the wife, knowing the disposition of her husband, persists in a course of conduct that brings on a state of facts of which she complains, she is not entitled to relief. *Duvale* v. *Duvale,* 34 *Atl. Rep.* 888; *affirmed,* 65 *N. J. Eq.* 771; 60 *All. Rep.* 1134. She had it in her power to stop the acts of which she complained."

A long line of cases commencing with *Close* v. *Close,* 10 *C. E. Gr.* (25 *N. J. Eq.*) 529; *Taylor* v. *Taylor,* 73 *N. J. Eq.* 745; 70 *Atl. Rep.* 323, and recently in the Court of Errors and Appeals (*Sachse* v. *Sachse,* 107 *N. J. Eq.* 41; 151 *Atl Rep.* 744), speaking through Judge Hetfield:

"It is impossible to define, with accuracy, the exact meaning of the term 'extreme cruelty' as used in the statute which provides for an absolute divorce on that ground, but this court in *Doty* v. *Doty,* 92 *N. J. Eq.* (at *p.* 660) ; 114 *Atl. Rep.* 546, has approved the rule as stated by Vice-Chancellor Van Fleet in *Black* v. *Black,* 30 *N. J. Eq.* (at *p.* 221), wherein he said, 'to justify a divorce *a mensa et thoro,* actual physical violence need not be proved, but such conduct by the husband must be shown as will justify the court in believing that if he is allowed to retain his power over his wife and she is compelled to remain subject to him, her life or her health will be endangered, or that he will render her life one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife. *Close* v. *Close, supra; English* v. *English,* 12 *C. E. Gr.* (27 *N. J. Eq.*) 585."

It is the duty of the wife to live with her husband at his home and give him her services and society. From these obligations she is relieved only if she can show that the conduct of her husband is such as will reasonably convince the court that her life or health are endangered, or her life rendered one of such extreme discomfort and wretchedness as

to incapacitate her to discharge the duties of the wife, or that the conduct of the husband, if continued, would have brought about these conditions. *Taylor* v. *Taylor, supra; Pinkinson* v. *Pinkinson,* 92 *N. J. Eq.* 699; 113 *Atl. Rep.* 143; *Pfender* v. *Pfender,* 106 *N. J. Eq.* 273; 150 *Atl. Rep.* 832; *Rogers* v. *Rogers,* 81 *N. J. Eq.* 479; 86 *Atl. Rep.* 935; *McVicker* v. *McVicker,* 46 *N. J. Eq.* 490; 19 *Atl. Rep.* 249; *Starky* v. *Starky,* 21 *N. J. Eq.* 133.

As was said in *Fallon* v. *Fallon,* 111 *N. J. Eq.* 512; 162 *Atl. Rep.* 409, the court must in each case look at the effect of the conduct complained of upon the health, mental and physical, of the wife where there is an essential element of extreme cruelty, that its effect upon the mind or body of the aggrieved spouse shall have been substantially deleterious, or that if allowed to continue it reasonably would have become so. Conduct which would imperil the health of a refined and delicate wife might be endured with comparative unconcern by one of a less sensitive nature. *Casey* v. *Casey,* 83 *N. J. Eq.* 603; 93 *Atl. Rep.* 720.

In my judgment the evidence does not warrant the conclusion that petitioner's life or health was in danger or her life made one of such discomfort and wretchedness as to incapacitate her physically or mentally to discharge her marital duties because of her husband's conduct, or to justify the court in believing that if he is allowed to retain his power over her and she is compelled to remain subject to him, her life or health will be in danger or her life rendered one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife.

That the mistakes and misunderstandings of this husband and wife should have been aired in open court is deplorable. It is clear that, in spite of everything which has occurred, they still have a very deep love and affection for the children. The husband stands ready to receive his wife in his home and to let her assume the responsibilities of wife and mother. I can see no reason why, with reasonable forebearance, the marriage should not be successful. I have the assurance of the children, having spoken to them, that they are hoping that the petitioner will come home and be beside them;

that they prefer living in their homestead under the roof and protection of their father and the love and kindness and sympathy of their mother.

The petitioner having failed to substantiate the charges made in the complaint, her action will, therefore, be dismissed.

With respect to the second count, under the act commonly known as the Poor act of 1924, there is a complaint filed to bring the established facts within the statute. The defendant having his home open for the petitioner to return, there could be no justification of a finding that the petitioner may become a public charge, as is required under this count. *Rose* v. *Rose,* 10 *N. J. Mis. R.* 390. There will be a dismissal of this count of the complaint.

I will sign an order in accordance with these findings.